AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

In the Matter of the Search of ) 
*(Briefly describe the property to be searched* ) 
*or identify the person by name and address)* )  Case No. **19-SW-118**
)
**AHSHA NATEEF TRIBBLE, UNDER RULE 41** )
)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):* **The person to be searched is Ahsha Nateef Tribble ("TRIBBLE"), a forty-seven year old African American female with black hair and brown eyes, and the property to be searched includes any items in her actual or constructive possession, including purses, luggage, briefcases, backpacks and other bags, as further described in the attached affidavit in support of search warrant, incorporated fully herein, including Attachment A.**

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized):* **The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of Title 18 U.S.C. § 1031 (Major Fraud against the United States), 18 U.S.C § 371 (Conspiracy), and 18 U.S.C. § 201 (Bribery of public officials), as further described in the attached affidavit in support of search warrant, incorporated fully herein, including Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1031 | Major Fraud against the United States; |
| 18 U.S.C § 371 | Conspiracy; and |
| 18 U.S.C. § 201 | Bribery of public officials |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Ana C. Brown, Special Agent,  DHS-OIG

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone. _____ *(specify reliable electronic means).*

Date:  04/03/2019

Deborah A. Robinson  Digitally signed by Deborah A. Robinson
Date: 2019.04.03 13:47:18 -04'00'

*Judge's signature*

City and state:  Washington, D.C.

Deborah A. Robinson

*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☑ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>**AHSHA NATEEF TRIBBLE, UNDER RULE 41** | )<br>)<br>)  Case No.  **19-SW-118**<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ Columbia
*(identify the person or describe the property to be searched and give its location)*:

**The person to be searched is Ahsha Nateef Tribble ("TRIBBLE"), a forty-seven year old African American female with black hair and brown eyes, and the property to be searched includes any items in her actual or constructive possession, including purses, luggage, briefcases, backpacks and other bags, as further described in the attached affidavit in support of search warrant, incorporated fully herein, including Attachment A.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of Title 18 U.S.C. § 1031 (Major Fraud against the United States), 18 U.S.C § 371 (Conspiracy), and 18 U.S.C. § 201 (Bribery of public officials), as further described in the attached affidavit in support of search warrant, incorporated fully herein, including Attachment B.**

**YOU ARE COMMANDED** to execute this warrant on or before _____ April 17, 2019 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Deborah A. Robinson _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    04/03/2019 11:00 am

Deborah A. Robinson
Digitally signed by Deborah A. Robinson
Date: 2019.04.03 13:47:36 -04'00'

*Judge's signature*

City and state:    Washington, D.C.

Deborah A. Robinson, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.:<br>  19-SW-118 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

 I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

*Person or Property to be searched*

The person to be searched is Ahsha Nateef Tribble ("TRIBBLE") a forty-seven year old African American female with black hair and brown eyes. A photograph of TRIBBLE appears below, as well as any items in the actual or constructive possession of Ahsha Nateef Tribble ("TRIBBLE"). The property to be searched includes purses, luggage, briefcases, backpacks or other bags in her actual or constructive possession.



**ATTACHMENT B**

*Property to be seized*

1.        The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of Title 18 U.S.C. § 1031 (Major Fraud against the United States), Title 18 U.S.C § 371 (Conspiracy), and Title 18 U.S.C. § 201 (Bribery of public officials), as described in the search warrant affidavit, including but not limited to:

   a.  Records and information relating to Federal Emergency Management Agency ("FEMA") Public Assistance ("PA") funding to Cobra Acquisitions, LLC ("COBRA"), COBRA subsidiaries, Mammoth Energy Services, Inc. ("MAMMOTH") and MAMMOTH subsidiaries.

   b.  Records and information relating to Donald Keith Ellison ("ELLISON"), President, Cobra Acquisitions, LLC.

   c.  Records and information relating to employees of COBRA, COBRA subsidiaries, MAMMOTH and MAMMOTH subsidiaries.

   d.  Records and information relating to Puerto Rico Electric Power Authority ("PREPA").

e. Records and information relating to payments, money transfers, gifts, tickets and items of value exchanged between Ahsha Nateef Tribble ("TRIBBLE") and ELLISON.

f. Records and information that constitute evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with TRIBBLE about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts.

g. Records and information that constitute evidence of the state of mind of TRIBBLE and ELLISON, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation.

2. For any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, including but not limited to the cellular devices assigned phone numbers ███-5384, ███-9822, ███-2763 (hereinafter, the "Devices"):

a. evidence of who used, owned, or controlled the Devices at the time of the above-described offenses, including at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved

2

usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

b.  evidence of software, or the lack thereof, that would allow others to control the Devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the attachment to the Devices of other storage devices or similar containers for electronic evidence;

d.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Devices;

e.  evidence of the times the Devices was used;

f.  passwords, encryption keys, and other access devices that may be necessary to access the Devices;

g.  documentation and manuals that may be necessary to access the Devices or to conduct a forensic examination of the Devices;

h.  records of or information about Internet Protocol addresses used by the Devices;

i.  records of or information about the Devices' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

j.  any evidence described in paragraph 1 above.

III.     **Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the digital devices and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the digital devices that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF AHSHA NATEEF TRIBBLE UNDER RULE 41** | **SW No. 19-SW-118** <br><br> **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, ANA C. BROWN, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the person and items in the actual or constructive possession of Ahsha Nateef Tribble ("TRIBBLE"), including purses, luggage, briefcases, backpacks or other bags, as further described below and in Attachment A, and seize the items described in Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.      I am a Special Agent with the Major Frauds and Corruption Unit of the Department of Homeland Security, Office of Inspector General ("DHS OIG"). I have been in this position since November 28, 2017. Prior to working for DHS OIG, I was a Special Agent for the Special Inspector General for the Troubled Asset Relief Program and the Air Force Office of Special Investigations. In 2012, I graduated from the Criminal Investigator Training Program and the U.S. Air Force Special Investigations Academy based at the Federal Law Enforcement

Training Center in Glynco, Georgia. I have also completed numerous training programs sponsored by the Federal Law Enforcement Training Center and the Council of Inspectors General on Integrity and Efficiency, including the Public Corruption Investigations Training Course. I have professional certifications as a Certified Fraud Examiner and a Certified Anti-Money Laundering Specialist. I attained a Bachelor of Arts in Political Science from the University of Illinois at Champaign-Urbana and a Master of Professional Studies in Security and Safety Leadership from George Washington University. During the course of my career, I have investigated many violations of the United States Code, Federal regulations, and the Uniform Code of Military Justice. During my employment as a Special Agent, I have participated in the execution of numerous search warrants of computers, computer equipment, software, and electronically stored information and have participated in the subsequent investigation and analysis of evidence seized pursuant to these warrants. As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C. § 1031 (Major Fraud against the United States), Title 18 U.S.C § 371 (Conspiracy), and Title 18 U.S.C. § 201 (Bribery of public officials) have been committed by TRIBBLE, who is the Federal Emergency Management Agency ("FEMA"), Region 2, Deputy Administrator and whose primary location of work is New York,

2

NY, and Donald Keith Ellison ("ELLISON"), who is the President of Cobra Acquisitions, LLC, a company located at 14201 Caliber Drive, Suite 300, Oklahoma City, OK, 73134 ("COBRA").

5.    TRIBBLE resides in New York.  It is believed that TRIBBLE arrived in the Washington D.C. area on or about April 1, 2019, in order to attend FEMA meetings. TRIBBLE has agreed to meet with DHS OIG on April 3, 2019, at DHS OIG Headquarters located at 395 E Street, SW, Washington, D.C. When coordinating the meeting set for April 3, 2019, TRIBBLE disclosed that she was flying out of the Washington D.C. area in the evening of April 3, 2019. Given the proximity between the meeting time and her flight, it is believed that she may attend the April 3, 2019, meeting at DHS-OIG Headquarters while carrying a briefcase or other bag containing work-related materials and/or luggage related to her travel. TRIBBLE may have to go through security at DHS-OIG Headquarters located at 395 E Street SW, Washington, D.C. Consequently, TRIBBLE may leave any bags, briefcases, and/or luggage related to her travel at another location, most likely FEMA Headquarters, located at 500 C Street SW, Washington, D.C. She is believed to be leaving straight to the airport from the meeting.

6.    For the reasons described below, there is probable cause to believe that TRIBBLE will have in her possession at the time of this meeting certain digital devices that contain evidence, fruits, contraband, instrumentalities, and information related to the offenses described in this affidavit (hereinafter the "Devices"). As described in further detail below, TRIBBLE is known to use at least three cellular telephones.  According to FEMA, she is assigned a device with telephone number ████-2763 for work-related purposes. TRIBBLE additionally has a personal cell phone ████-5384 registered in her name. A review of TRIBBLE's iCloud search and seizure warrant return revealed she has a "burner phone" assigned telephone number ████-9822. A review of

her personal email account indicates that TRIBBLE also utilizes a personal Apple iPad.[1] A reasonable person carries their cellular phones and portable digital devices on their person to answer and place calls or other means of communication and to conduct personal and business-related transactions.

## PROBABLE CAUSE

7.      TRIBBLE is currently the Deputy Regional Administrator for FEMA Region II, with oversight for the operational aspects of regional disaster response and recovery, mitigation and preparedness in New York, New Jersey, Puerto Rico, and the U.S. Virgin Islands. From September 2017 – September 2018, TRIBBLE was deployed to Puerto Rico following Hurricane Maria as the Power Sector Chief for Response and the Infrastructure Chief for Recovery. While in these positions TRIBBLE advised PREPA on procurement matters, as the funding for PREPA contracts was supplied by FEMA. Regulations that governed TRIBBLE in connection with her role as Power Sector Chief at the time of these offenses stated, "A present or former employee if, or person acting on behalf of or advising, the US on a procurement, who has or had access to such information shall not disclose it before the award of the contract to which the information relates." *See* 48 CFR § 3.104-4.

8.      On or about September 20, 2017, the Commonwealth of Puerto Rico experienced the landfall of Category 4 Hurricane Maria causing widespread and catastrophic damage throughout the island. On or about September 20, 2017, President Donald Trump declared a National Disaster for the Commonwealth of Puerto Rico.

---

[1] In order to preserve the integrity of the covert nature of this investigation, law enforcement has been unable to determine whether TRIBBLE also has been assigned work-related tablets or laptops.

4

9.     On or about October 2017, TRIBBLE was sent by FEMA to support the Commonwealth of Puerto Rico's recovery from Hurricane Maria.

10.     Puerto Rico Electric Power Authority ("PREPA") is an electric power company and the government-owned corporation of Puerto Rico responsible for electricity generation, power distribution and power transmission on the island.

11.     On or about October 19, 2017, PREPA awarded COBRA a $200,000,000 contract to perform repairs to the Puerto Rico electrical system.  COBRA is a wholly owned subsidiary of Mammoth Energy Services, Inc., 14201 Caliber Drive, Suite 300, Oklahoma City, OK, 73134. Mammoth Energy Services, Inc. is a publicly traded company on the NASDAQ stock exchange under the stock symbol TUSK.  ELLISON has been the President of COBRA since January 2017.

12.     On or about December 22, 2017, FEMA approved $200,000,000 of Public Assistance ("PA") funds to PREPA in support of Hurricane Maria recovery and repair efforts. At the time of the FEMA PA funds approval, FEMA documented on the Eligibility Determination Memorandum that COBRA had already invoiced PREPA for approximately $129,067,000.  FEMA's PA grant program provides federal assistance to government organizations and certain private nonprofit organizations following a Presidential disaster declaration.  Concerning the PA grant program, FEMA's primary responsibilities are to determine the amount of funding, participate in educating the applicant on specific program issues and procedures, assist the applicant with the development of projects, and review the projects for compliance.  FEMA's legal relationship is with the recipient of PA funds, and FEMA should not be in direct contact with or advising contractors associated with the applicant's contracting process utilizing PA funds.

5

13.     On or about January 28, 2018, PREPA amended the contract with COBRA, increasing the contract amount to $445,429,800.  On or about February 2018, PREPA amended the COBRA contract again increasing the contract amount to $945,429,800.

14.     On or about May 26, 2018, PREPA awarded a new contract to COBRA for $900,000,000.  This brought the total amount of PREPA contracts with COBRA to $1,845,429,800.

15.     On June 15, 2018, the Department of Homeland Security, Office of Inspector General ("DHS OIG") received a complaint alleging that TRIBBLE was steering contracts and accepting bribes from COBRA in exchange for flights aboard private aircraft and casino trips. DHS OIG investigative steps have confirmed that TRIBBLE and ELLISON were engaged in a romantic relationship.

16.     In November 2018, DHS OIG obtained a search and seizure warrant, Misc. Case Number 18-1690(SCC), for TRIBBLE's personal email, ████3@gmail.com. A review was conducted of TRIBBLE's personal emails which contained email communications with ELLISON, at ████n@mammothenergy.com and ████5@gmail.com.

17.     In December 2018, DHS OIG obtained a search and seizure warrant, Misc. Case No. 18-673(FAB), for ELLISON's personal email, ████5@gmail.com. A review was conducted of ELLISON's personal emails which contained email communications with TRIBBLE, at ████e@fema.dhs.gov and ████3@gmail.com.

18.     On January 25, 2018, TRIBBLE sent an email from her personal account, ████3@gmail.com, to ELLISON's work email address, at ████n@mammothenergy.com, stating, *"Hey, Need to get this squared away.  Can always change it.  Also there are rooms at the Conrad (Battery Park) and the W.  Hamilton?  Let's talk today. AT*

6

| | | |
|---|---|---|
| *Jan 31* | | *Feb 2* |
| *(You)* | *(ME)* | *(US)* |
| *DL922/DL2418* | *DL4755* | *DL485* |
| *SJU to LGA* | *DCA-LGA* | *JFK to SJU (nonstop)* |
| *8am-2:48pm* | *2:00p – 3:25p* | *8am – 1:05pm"* |

19.     On February 11, 2018, TRIBBLE sent an email from her personal email account,

█████3@gmail.com, to ELLISON, at his personal email account,█████5@gmail.com, and

stated, *"Good morning, First I hope you are the best birthday present ever for the boys!!! I know*

*they are having a blast.  Proud to know such an awesome dad!  I was told paperwork for my*

*transfer to NY has been signed.  However, I have not seen anything so not sure of timing.  I think*

*I have to look for just me at the moment, because I am not sure what Jo wants to do.  I just*

*looked quickly online in lower Manhattan and midtown for rentals.  Office is in World Trade.  I*

*just need safety, W/D. and furnished good, though I have a lot of crap in storage if needed."*  On

February 14, 2018, ELLISON responded, *"Yes ma'am, I got it and have somebody on it*

*already".*

20.     On February 23, 2018, ELLISON, from his personal email account,

█████5@gmail.com, forwarded an email titled *NYC Apartment/Broker Introduction* to

TRIBBLE's personal email,█████3@gmail.com, and stated, *"Please reach out to Jay about*

*your needs".*

21.     On July 13, 2018, TRIBBLE flew from Luis Munoz Marin International Airport

("SJU") located in San Juan, Puerto Rico to Orlando International Airport ("MCO") located in

Orlando, FL.

22.     On July 17, 2018, ELLISON flew from Panama City Beach, FL ("ECP") to MCO
and picked up a rental car from Hertz Rental Cars upon arrival with a drop off location of Miami
International Airport ("MIA").  On July 17, 2018, ELLISON checked into the Conrad Ft.
Lauderdale hotel ("CONRAD") located in Fort Lauderdale, FL.

23.     On July 18, 2018, TRIBBLE made a debit card purchase at the CONRAD, the
same hotel into which ELLISON checked in one day earlier.  On July 18, 2018, ELLISON
purchased an American Airlines one-way ticket for TRIBBLE from MIA to ORD. The credit
card used to purchase the ticket was ELLISON's Capital One Quicksilver MasterCard #█████
██████189.

24.     On July 19, 2018, ELLISON checked out of the CONRAD and on the same day
TRIBBLE checked into the JW Marriot Marquis located in Miami, FL.

25.     On July 20, 2018, ELLISON returned the Hertz Rental Car to MIA.  TRIBBLE
boarded the American Airlines Flight 1362 from MIA to MCO, which ELLISON purchased.
ELLISON boarded Delta flight 1987 from MIA to Atlanta, GA. In sum, they both left Miami on
the same day.

26.     On August 24, 2018, ELLISON sent an email from his work email account,
████n@mammothenergy.com, to TRIBBLE, at her personal account,█████3@gmail.com,
and stated, *"Here are 2 tickets to Hamilton (NY) https://████████1t."*  The link in the email
references tickets on Ticketmaster Ticketing Service but the link requires a login to see the
tickets. The same date, ELLISON received an email at his personal email account,
████5@gmail.com, from ███████t@email.ticketmaster.com which stated, *"Ahsha*

2

*Has Accepted Your Ticket Transfer!"* The email confirms the ticket transfer of the tickets purchased by ELLISON for two seats in the Orchestra Section of the Broadway Musical "Hamilton" for $1,831.94 at the Richard Rodgers Theater, New York City, NY on Friday August 24, 2018.

27.     On September 8, 2018, ELLISON purchased $3,000 in casino chips at the Casino Del Mar, Puerto Rico.  Surveillance footage from the Casino on September 8, 2018 shows TRIBBLE and ELLISON in the casino together at the cash cage as well as the gambling tables.

28.     DHS OIG obtained a Search and Seizure Warrant for ELLISON's personal email account, ███████5@gmail.com. Upon receipt of the Search and Seizure Warrant returns, DHS OIG conducted a review of the results, which contained saved screen shots of Apple iMessages and SMS text between TRIBBLE (███████-5384) and ELLISON ███████-6860). In my training and experience, the sender's messages are depicted in blue bubbles and the recipient's messages are depicted in gray bubbles. The recipient's name or phone number (as listed in the sender's contacts) is depicted at the top of the screen shot.

29.     The following iMessage was located in a search of ELLISON's personal email account. Accordingly, the blue (sender) bubbles are believed to be associated with ELLISON. The gray bubbles are believed to be associated with TRIBBLE based on the telephone number located at the top of the screen shot):

3



Your affiant believes that the messages above between TRIBBLE and ELLISON are discussing

the fourth amendment to the original contract awarded to COBRA. TRIBBLE appears to notify

ELLISON that the amendment was approved and that she asked for additional money and

requirements be awarded to COBRA as part of the amendment. TRIBBLE stated she tried for

$500,000,000 and a six month performance period but lost, and that they would revisit the issue

4

again in two weeks.  TRIBBLE was not authorized to make these disclosures to ELLISON. On

or about January 28, 2018, PREPA executed the fourth amendment to the contract with COBRA,

increasing the contract amount by $245,429,800.  On or about February 2018, PREPA executed

the fifth amendment to the COBRA contract again increasing the contract amount by an

additional $500,000,000.

       30.     The following iMessage was also located in a search of ELLISON's personal

email account. Accordingly, the blue (sender) bubbles are believed to be associated with

ELLISON. The gray bubbles are believed to be associated with TRIBBLE based on the

telephone number located at the top of the screen shot):



Your affiant believes that in the messages above, TRIBBLE is notifying ELLISON that the

amendment is good and there will be a meeting about payment for previous work performed by

COBRA the following day. PREPA historically has long wait times before issuing payments to

contractors. TRIBBLE appears to be working on getting PREPA to release funds to COBRA at

a faster pace than is typical. TRIBBLE indicates she is "popping off" on people in an effort to

6

push the payments to COBRA.  ELLISON instructs TRIBBLE to stop "popping off," but says he loves her for doing it.

31.     The following iMessage was also located in a search of ELLISON's personal email account. Accordingly, the blue (sender) bubbles are believed to be associated with ELLISON. The gray bubbles are believed to be associated with TRIBBLE based on the name located at the top of the screen shot):



Your affiant believes that in the messages above, TRIBBLE is speaking with ELLISON about

the work assignments that are being distributed by PREPA to contractors. TRIBBLE informs

ELLISON that the work assigned to COBRA is unfair or smaller in relation to the work being

assigned by PREPA to itself. TRIBBLE asks again for ELLISON to contact her regarding an

8

amendment to the COBRA contract. Again, TRIBBLE was prohibited from making these disclosures.

32.    In December 2018, DHS OIG conducted a review of TRIBBLE's Call Detail Records (CDRs), for TRIBBLE's personal phone number ████-5384, from Verizon Wireless, Inc. TRIBBLE's International Mobile Equipment Identity (IMEI) associated with phone number ████-5384 was "████████249". The aforementioned IMEI number was associated to an Apple iPhone 8 Plus.

33.    In December 2018, DHS OIG conducted a review of ELLISON's CDRs, for phone number ████-6860, which was registered to him during the relevant time period according to Verizon Wireless, Inc. The IMEI associated with phone number ████-6860 was "████████790". The aforementioned IMEI number was associated to an Apple iPhone X.

34.    Based on a review of telephone records, between January 15, 2018, and October 31, 2018, TRIBBLE's personal telephone number (████-5384) was in communication with ELLISON's telephone number (████-6860) approximately 863 times, 59% were Voice Calls and 41% were Text Messages.

35.    In February 2019, DHS OIG obtained a search and seizure warrant, Misc. Case No. 19-300(M), for TRIBBLE's and ELLISON's Apple iCloud accounts, ████3@gmail.com and ████5@gmail.com. A review was conducted of TRIBBLE's and ELLISON's Apple iCloud accounts, which accounts contained Apple iMessages, SMS texts, and photographs between TRIBBLE's personal telephone number (████-5384) and ELLISON's known telephone number (████-6860).

9

36. Both TRIBBLE and ELLISON's iCloud Photo Library contained photos of ELLISON's Capital One Credit Card.

37. Apple iMessages from TRIBBLE's iCloud Backup showed that TRIBBLE's personal telephone number (█████-5384) and ELLISON's known telephone number (███ █-6860) exchanged the following messages, demonstrating that ELLISON was paying for TRIBBLE's personal travel:



38. Based on a review of the iCloud messages, TRIBBLE's personal phone number (█████-5384) exchanged the following text messages with Steve Wolf (█████-2370), known to be a COBRA employee, regarding TRIBBLE's use of a "burner" phone:

10



39.  In my training and experience, a "burner phone" is typically an inexpensive mobile phone that is designed for temporary use, after which it may be discarded. Criminals often utilize "burner phones" because it can be paid for in cash without a contract from a service provider and loaded with prepaid minutes. Due to the fact that a "burner phone" can be paid for in cash and has no contract with a service provider, there is no telephone company record connecting the user to the phone number. The contact list in TRIBBLE's Apple iCloud account associated with her personal phone number (███-5384) contained a contact titled "Burner" (███-9822).

11

40.     Based on a review of CDRs, between January 23, 2018, and January 31, 2018, TRIBBLE's "burner" phone number (███-9822) was in communication with ELLISON's phone number (███-6860) approximately 138 times, 0% were Voice Calls and 100% were Text Messages.  TRIBBLE's burner number, ███-9822, was associated with Verizon Wireless, Inc. The time period denoted above, while short, coincides with time period that PREPA amended the contract with COBRA. On or about January 28, 2018, PREPA amended the contract with COBRA, increasing the contract amount to $445,429,800.

41.     FEMA assigned TRIBBLE a work telephone in connection with her duties and responsibilities, assigned telephone number ███-2763. FEMA employees are required to complete and sign a FEMA Form 61-9, Custody Receipt for Government Property on Personal Charge, when issued a government mobile phone. Within the FEMA Form 61-9, FEMA employees must sign and certify the form acknowledging the following statement "By my signature below, I acknowledge possession of the government property listed above. I accept full responsibility for the proper use and protection of the property. I understand that the property is FOR OFFICIAL USE ONLY and it may not be transferred except by return to or approval of the Issuing Official."

42.     In December 2018, DHS OIG conducted a review of TRIBBLE's CDRs for TRIBBLE's FEMA phone number ███-2763, from AT&T Mobility LLC. TRIBBLE's International Mobile Equipment Identity (IMEI) associated with phone number ███-2763 was ███525". The aforementioned IMEI number was associated to an Apple iPhone 6S.

12

43.     Based on a review of telephone records, between January 2, 2018, and October 19, 2018, TRIBBLE's FEMA phone number (███-2763) was in communication with ELLISON's known telephone number (███-6860) approximately 822 times, of which 99% were Voice Calls and 1% were Text Messages.

44.     TRIBBLE's official FEMA work email address is █████e@fema.dhs.gov. On September 14, 2018, TRIBBLE, at █████e@fema.dhs.gov, received an email from Fernando M. Padilla, PREPA Project Management Office, titled Meeting Notes – Call with FEMA and PREPA RE: Vieques Distribution Permanent Work.  Vieques is an island-municipality of the Commonwealth of Puerto Rico approximately 8 miles east of the Puerto Rican mainland.  The hurricane also destroyed the electrical power grid on the island of Vieques which would also need to be repaired. The email stated the topics discussed during the call to include whether PREPA wanted to use COBRA for the project on Vieques.

45.     That same date, the aforementioned email was forwarded via TRIBBLE's FEMA work phone to her personal email account, █████3@gmail.com. (The email itself indicated it was being sent via her FEMA mobile device.) The email was then forwarded via TRIBBLE's personal cellular phone to ELLISON's personal email, █████5@gmail.com. (The email itself indicated it was being sent from her personal iPhone.) ELLISON then forwarded the email from his personal email to Arty Straehla, the Chief Executive Officer of Mammoth Energy Services, Inc. (COBRA's parent company), at █████a@mammothenergy.com. TRIBBLE was not authorized to make these disclosures to ELLISON.

13

46.     Your affiant submits that the foregoing evidence establishes probable cause that

ELLISON and TRIBBLE committed the crime of bribery in violation of 18 U.S.C. § 201, as well

as the other offenses described above.  In particular, the information set forth above establishes

that since at least December 2017, ELLISON has provided TRIBBLE with things of value,

including airline tickets and Hamilton tickets.  In addition, the information set forth above

establishes that TRIBBLE communicated with ELLISON about confidential details of the

PREPA contracts.  Further, the evidence set forth above establishes that TRIBBLE likely used

her digital devices in furtherance of the bribery scheme by exchanging emails and text messages

with ELLISON about the things of value she received and the PREPA contracts.

## TECHNICAL TERMS

47.     Based on my training and experience, and information acquired from other law

enforcement officials with technical expertise, I know the terms described below have the

following meanings or characteristics:

a.      "Digital device," as used herein, includes the following three terms and their

respective definitions:

1)      A "computer" means an electronic, magnetic, optical, or other high

speed data processing device performing logical or storage functions, and includes any data storage

facility or communications facility directly related to or operating in conjunction with such device.

*See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information

processing using a binary system to represent information.  Computers include, but are not limited

14

to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2) "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3) "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b. "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and

15

other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, email, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

      c. A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

      d. A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites

16

orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

g.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers,

17

each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

        h.     The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

        i.     "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an email address, an email mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

18

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

19

m.     "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.     "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software.  A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network.  A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.    One aspect of P2P file sharing is that multiple files may be downloaded at the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

i.     When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

ii.     Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

20

o.      "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.  This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

p.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.      "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and

21

other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

48.    Based on my training, experience, and research, I know that the Apple iPhone 8 Plus and 6S have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigational device, and PDA.   In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offense(s) under investigation.

### COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

49.    As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found on TRIBBLE's person to include purses, luggage, briefcases, and backpacks in her possession at the time of the search and information that might be found within the Devices, in whatever form they are found.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the Devices for at least the following reasons:

      a.    Individuals who engage in criminal activity, including violations of Title 18 U.S.C. § 1031 (Major Fraud against the United States), Title 18 U.S.C § 371 (Conspiracy), and Title 18 U.S.C. § 201 (Bribery of public officials), use digital

devices like wireless telephones to communicate with co-conspirators, to store digital information related to their illegal activity, which can include logs of online chats with co-conspirators, email correspondence, text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social media accounts. Paragraphs 28-44 above are hereby incorporated by reference as evidence of the use of digital devices and wireless telephones in furtherance of criminal activity in this case.

b. Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c. Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and

until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

50. As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital Devices were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Devices at issue here because:

24

a.      Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital Devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data stored in the Devices, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, email programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files

25

were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, email, email address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be

26

merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.      I know that when an individual uses a digital device to communicate with co-conspirators or to send/receive items of value, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved;

27

records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

51.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital

28

data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.  Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.  Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the

29

image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject

30

to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e.        Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.   Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.   Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

31

f.      Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

52.     In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a.   The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b.   The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings

32

it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c. In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the Devices will be specifically chosen to identify the specific items to be seized under this warrant.

**AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT**

53. Because forensic examiners will be conducting their search of the Devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search of the Devices at any time of the day or night.

33

## CONCLUSION

62.    I submit that this affidavit supports probable cause for a warrant to search the individual described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

ANA C. BROWN
Special Agent
Department of Homeland Security
Office of Inspector General

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on April 3, 2019.

Deborah A. Robinson
Digitally signed by Deborah A. Robinson
Date: 2019.04.03 13:48:13 -04'00'

UNITED STATES MAGISTRATE JUDGE

34